## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YASINI DOE
c/o International Refugee Assistance Project
One Battery Park Plaza, 33rd Floor
New York, N.Y. 10004,

JAWAD DOE
c/o International Refugee Assistance Project
One Battery Park Plaza, 33rd Floor
New York, N.Y. 10004,

REZA DOE
c/o International Refugee Assistance Project
One Battery Park Plaza, 33rd Floor
New York, N.Y. 10004,

Plaintiffs,

– *versus* –

U.S. DEPARTMENT OF STATE,
2201 C Street, NW
Washington, D.C. 20520;

MARCO RUBIO, in his official capacity as Secretary of
State,
c/o U.S. Department of State
2201 C Street, NW
Washington, D.C. 20520;

Defendants.

**Case No. 1:25-cv-3676**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      Plaintiffs Yasini, Jawad and Reza Doe,[1] (together, "Plaintiffs") are three Afghan nationals who served the United States by providing critical security services to the U.S. government during its military campaign in Afghanistan, at great personal risk to themselves and their families. Following the abrupt withdrawal of U.S. forces from Afghanistan in August 2021, Afghan allies who had served the U.S. government, like Plaintiffs, were left facing even greater risk of persecution by the Taliban, who had returned to rule. Each Plaintiff fled into hiding to protect themselves and their families. Yet despite their fear, they remained hopeful that they would have a route to safety by immigrating to the United States through the Afghan Special Immigrant Visa ("SIV") program: a life-saving program created by Congress in 2009 to protect Afghan allies, like Plaintiffs, who supported the U.S. government in Afghanistan.

2.      The law provides a pathway through the SIV program for people who worked either directly for the U.S. government or on behalf of the U.S. government pursuant to a contract or subcontract between their employer and the U.S. government. Plaintiffs had provided critical security services pursuant to a U.S. government subcontract held by their employer, the National Public Protection Force ("NPPF"), an entity owned by the U.S.-backed Afghan government; the U.S. Department of Defense had formally agreed to contract with the NPPF for security services in Afghanistan since 2012.

3.      In the weeks after the U.S. withdrew from Afghanistan, each Plaintiff submitted the requisite documentation of their NPPF employment to the State Department in order to apply for approval from the U.S. Chief of Mission ("COM"), the first step to apply to the SIV program.

---

[1] Plaintiffs have filed a motion for leave to proceed under pseudonym simultaneously with this complaint.

Plaintiffs met all the statutory eligibility requirements and believed that they would be approved to proceed to the next stage in the application process. But contrary to the straightforward language in the statute, the State Department determined that they did not qualify because their employer was an Afghan state-owned entity, even though Plaintiffs had worked on behalf of the U.S. government pursuant to a U.S. government contract.

4. To qualify for an SIV, the Afghan Allies Protection Act ("AAPA") requires only that applicants were employed by, or on behalf of, the U.S. government. Congress placed no restriction on the nature of the hiring entity; the disqualification of Afghan state-owned entities is an unlawful limitation imposed solely by the State Department.

5. Until Plaintiffs received denials stating that they lacked qualifying employment— which they received more than a year and a half after applying to the program—they had no notice that the State Department would impose a rule barring them from the SIV program because of the nature of their employer.

6. Shocked and disappointed, each Plaintiff filed an appeal of their COM denial, only to receive the same denial repeating the same justification. In addition to Plaintiffs, at least dozens of other Afghan allies who were employed by an Afghan state-owned entity, or the Afghan government, have received similar denials, notwithstanding their work under a U.S. government contract.

7. The government's formal policy of denying COM approval to individuals who were hired by the Afghan government or Afghan state-owned entities to perform work for the U.S. government, and its denials of Plaintiffs' applications for COM approval, violate the Afghan Allies Protection Act and the Administrative Procedure Act ("APA"), and prevent statutorily eligible applicants like Plaintiffs from pursuing their SIV applications. Plaintiffs therefore seek an order

declaring the denial of their individual COM applications and the agency's policy unlawful, setting them aside, and directing Defendants to comply with statutory law and agency rules.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) because Defendants include a federal agency that is a resident of the District of Columbia, and because a substantial part of the events or omissions giving rise to the Complaint occurred within the District of Columbia.

## THE PARTIES

10.     Plaintiff Yasini Doe is an Afghan national who was employed by NPPF, a U.S. government subcontractor, to work as a security guard on behalf of the U.S. government from August 2019 to August 2021. He applied for COM approval in November 2021. His application was denied in June 2023 on the basis that he lacked qualifying employment because he was employed by NPPF, a state-owned enterprise of the Afghan government. Yasini appealed his COM denial in July 2023; in December 2023, it was denied for the same reason provided in the initial denial. He reapplied for COM approval in December 2023 and received a denial in July 2024 repeating the same denial reason as before. Because of the U.S. government's unlawful policy, Yasini is prevented from pursuing his application for COM approval, even as he continues to face danger in Afghanistan because of his work for the United States.

11.     Plaintiff Jawad Doe is an Afghan national who was employed by NPPF, a U.S. government subcontractor, to work as a security guard on behalf of the U.S. government from April 2013 to August 2021. He applied for COM approval in November 2021. His application was denied in June 2023 on the basis that he lacked qualifying employment because he was employed by NPPF, a state-owned enterprise of the Afghan government. Jawad appealed his COM denial in

July 2023, and his appeal was denied in December 2023 for the same reason. Because of the U.S. government's unlawful policy, Jawad is prevented from obtaining COM approval and pursuing an SIV, even as he continues to face danger in Afghanistan because of his work for the United States.

12.    Plaintiff Reza Doe is an Afghan national who was employed by NPPF, a U.S. government subcontractor, to work as a security guard on behalf of the U.S. government from January 2019 to August 2021. He applied for COM approval in November 2021. His application was denied in June 2023 on the basis that he lacked qualifying employment because he was employed by NPPF, a state-owned enterprise of the Afghan government. Reza appealed his COM denial in October 2023, and his appeal was denied in December 2023 for the same reason. Because of the U.S. government's application of its unlawful policy, Reza is prevented from obtaining COM approval and pursuing an SIV, even as he continues to face danger in Afghanistan because of his work for the United States.

13.    Defendant the U.S. Department of State ("State Department") is an executive agency of the United States responsible for the administration of the Afghan SIV program, including the COM approval process, pursuant to the AAPA.

14.    Defendant Marco Rubio is sued in his official capacity as the Secretary of State. Defendant Rubio is responsible for the State Department's administration of the Afghan SIV program pursuant to the AAPA and oversees the State Department components responsible for the COM approval process.

## STATEMENT OF FACTS

### Afghan Allies Protection Act

15.    In 2009 Congress enacted the Afghan Allies Protection Act in recognition of the need to establish a pathway to safety for the tens of thousands of Afghan nationals who placed

their lives at risk to provide critical assistance to the U.S. mission in Afghanistan. Pub. L. No. 111-8, 123 Stat. 807 (2009), codified at 8 U.S.C. § 1101 note.

16.    The AAPA enables certain Afghan nationals who were employed by or on behalf of the U.S. government to immigrate permanently to the United States or, if already located in the United States, to adjust their immigration status to become lawful permanent residents.

17.    As relevant here, to be eligible for the program, a person must be a citizen or national of Afghanistan; have been employed for at least one year "by, or on behalf of, the United States  government"; have provided "faithful and valuable service" in employment; and have experienced an ongoing serious threat due to their work for the U.S. government.[2] AAPA § 602(b)(2)(A).

18.    As set forth in its Foreign Affairs Manual ("FAM"), the State Department interprets the requirement for employment "by, or on behalf of" the U.S. government as being met either when an applicant is i) directly employed by the U.S. government or ii) hired by and paid through a U.S. government contractor or subcontractor. *See* 9 FAM 502.5-12(C)(b)(9)(c)(U); *see also* U.S. Dep't of State, *Report of the Afghan SIV Program* 6-7 (Jan. 2021), https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q1-Jan-2021.pdf.

### *COM Application Process*

19.    At the outset of the SIV application process, every applicant (whether inside or outside of the United States) must apply for and obtain approval from the Chief of Mission to Afghanistan or their designee ("COM designee"), confirming their employment and faithful and

---

[2] In 2021, the State Department determined that all Afghan SIV applicants are inherently experiencing an ongoing serious threat due to their work. *See* U.S. Dep't of State, 9 FAM 502.5-12(C)(a)(4)(b).

valuable service to the U.S. government. *See* AAPA § 602(b)(2)(D). COM approval confirms the applicant's eligibility for the Afghan SIV program and authorizes the applicant to proceed to the next stage in the SIV application process.

20.    Applicants submit their application for COM approval to the State Department's National Visa Center ("NVC"), which then transfers the application to the Afghan Special Immigrant Visa Unit ("ASIV"), a component of the State Department based in Washington, D.C., for review and adjudication. The ASIV Director and Deputy Director are the current COM designees and are responsible for granting or denying COM approval.

21.    When considering an application for COM approval, the Chief of Mission or their designee must "conduct a risk assessment" of the applicant and "an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government." AAPA § 602(b)(2)(D)(i); *see also* 6 USCIS Policy Manual, H.9, § D (last accessed Oct. 15, 2025), https://www.uscis.gov/policy-manual/volume-6-part-h-chapter-9.

22.    If the Chief of Mission or their COM designee denies an applicant COM approval, they must provide "a written decision that provides, to the maximum extent feasible, information describing the basis for the denial, including the facts and inferences underlying the individual determination." AAPA § 602(b)(2)(D)(ii)(I)(aa).

23.    Applicants are entitled to "one written appeal" per denial of COM approval.  This appeal "may request reopening of such decision and provide additional information, clarify existing information, or explain any unfavorable information." AAPA § 602(b)(2)(D)(ii)(I)(bb)(BB).

24.     Should the applicant be denied COM approval and "appeal" the negative decision, that challenge is handled by the same decisionmakers and in the same manner as the initial application.  In other words, the "appeal" is more akin to a request for reconsideration.

25.     Only after obtaining COM approval can applicants proceed to either (1) submit a visa application to the State Department (if outside the United States); or (2) submit a petition for special immigrant status and/or application for permanent residency to U.S. Citizenship and Immigration Services (if inside the United States).

### *State Department Guidance on Qualifying Employment*

26.     The State Department provides guidelines on its website for individuals applying for COM approval, including what documentation applicants are required to submit in support of their application.

27.     Among other things, applicants are required to provide a letter of recommendation from a supervisor documenting their faithful and valuable service to the U.S. government, and an employment or human resources ("HR") letter providing details of their employment qualifying them for an Afghan SIV. Among other details, the employment letter should contain contract or subcontract information showing that the applicant was employed by, or on behalf of, the U.S. government, including the contract number, period of performance of the contract, and name of the prime contractor.

28.     The State Department's guidance specifies certain types of employment that qualify as employment "by, or on behalf of" the U.S. government as well as types of employment that do not qualify.

29.    For example, applicants who only worked under a U.S. grant or cooperative agreement or a U.S. government license only, rather than a U.S. government contract, do not qualify for an Afghan SIV.

30.    Upon information and belief, the State Department updated its COM instructions in or around 2024 to include new instructions relating to work for Afghan government entities. These instructions provide that applicants who *only* worked for the Afghan security forces, including the military, police or government, do not qualify for COM approval, consistent with the AAPA and provisions of the FAM providing that employment on behalf of the U.S. government must be pursuant to a contract or subcontract with the U.S. government to be qualifying employment for the SIV program.

31.    The State Department's website also contains a Frequently Asked Questions document setting out procedures for COM applicants to follow. The document instructs that "work for the Afghan government, Afghan military, or Afghan security forces (police) is not qualifying employment *unless* that employer held a contract with the U.S. government." (emphasis added). *See* Afghan Special Immigrant Visa Chief of Mission Approval Process, Frequently Asked Questions, U.S. Dep't of State (last accessed Oct. 15, 2025), https://travel.state.gov/content/dam/visas/SIVs/ASIV-COM-Process-FAQs-TSG-03192024.pdf. Thus, the State Department makes clear that work done for an employer who was under contract with the U.S. government, including the Afghan government, constitutes qualifying employment.

**<u>ASIV's Blanket Policy of Denying COM Approval to Employees of the Afghan</u>**

**<u>Government or Afghan State-Owned Entities</u>**

32.     Since at least 2023, ASIV has adopted a policy of denying COM approval to applicants who were directly employed by the Afghan government or an Afghan state-owned entity, even when that employer held a contract or subcontract with the U.S. government.

33.     Meanwhile, ASIV considers applicants hired by *private* companies that contract or subcontract with the U.S. government as meeting the qualifying employment requirement and routinely grants those applicants COM approval.

34.     ASIV's policy is not publicized or explained on the State Department's website or any other publicly available document. Indeed, ASIV's policy directly contradicts public-facing agency guidelines currently available on the State Department's website instructing that employment by the Afghan government qualifies an applicant for an SIV where the employer has a contract with the U.S. government.

35.     ASIV consistently denies applicants employed by the Afghan government or an Afghan state-owned entity, by issuing denial letters stating that applicants lack qualifying employment "by or on behalf of the U.S. government" because they were "employed by the Afghan government" or "a state-owned enterprise of the Afghan government" and claiming that such work does not constitute "qualifying employment for the Afghan SIV program."

36.     The denial letters provide no justification or explanation for the decision to deny COM approval to employees of the Afghan government or Afghan state-owned entities even when that work was for an employer who contracted with the U.S. government.

37.     ASIV's policy of disqualifying Afghan government and Afghan state-owned entity employees from the SIV program contravenes the AAPA, which provides that employment "by or

on behalf of the U.S. government" is qualifying employment, without any restriction based on the governmental, state-owned or private nature of the employer.

38.    Upon information and belief, ASIV also fails to conduct any independent review of applications filed by employees of the Afghan government or Afghan state-owned entities, including NPPF employees, as required under the AAPA. Rather, ASIV denies these applications outright based solely on the identity of the applicant's employer, rather than the nature of their work on behalf of the U.S. government.

## NPPF Denials

39.    In dozens of cases, ASIV has denied COM approval to employees of the NPPF, or APPF,[3] an Afghan state-owned enterprise that—until U.S. forces withdrew from Afghanistan— hired individuals to provide security services to U.S. forces in Afghanistan pursuant to a contract or subcontract with the U.S. government.

40.    As a result of the U.S. government's refusal to grant COM approval to statutorily eligible former NPPF employees—which would allow them to apply for an SIV and relocate to the United States—former NPPF employees are forced to remain in dangerous conditions in Afghanistan or attempt to flee to another country. Upon information and belief, some NPPF employees have since been imprisoned by the Taliban, while others have been murdered.

41.    The relationship between APPF/NPPF and the U.S. government is well-documented. In 2010, then-Afghan President Karzai issued a Presidential Decree announcing the dissolution of all private security contractors and transfer of all security functions in Afghanistan to the APPF/NPPF. Thereafter, in December 2012, the U.S. Department of Defense ("DOD") and

---

[3] The NPPF was formerly known as the Afghanistan Public Protection Force ("APPF"). The terms NPPF, APPF and APPF/NPPF are used interchangeably in this complaint.

the Afghan Ministry of Interior ("MOI") entered into a bilateral security agreement to facilitate the provision of security services and other logistic support, supplies and services to U.S. personnel deployed to Afghanistan (the "Agreement").

42.      The Agreement provided that security services for U.S. personnel in Afghanistan would be fulfilled by the Afghan government through the APPF, whose employees would provide security services to U.S. forces, including services such as protecting U.S. warehouses and other facilities, ensuring the safe passage of U.S. personnel and supply convoys, and providing medical first responder services. The Agreement further provided for training, screening and vetting of all APPF personnel used to fill U.S. government orders.

43.      During its military campaign in Afghanistan, the U.S. government contracted with certain private companies to provide services, for example delivery or storage of goods. These prime contractors would in turn subcontract with APPF/NPPF to provide security services, for example warehouse perimeter security, to fulfil the prime contract, consistent with the Agreement.

### Plaintiffs' Applications for and Denial of Chief of Mission Approval

44.      Plaintiffs Yasini, Jawad and Reza Doe are three former NPPF employees who were subcontracted by NPPF to work as security guards on behalf of the U.S. government.

45.      Along with dozens of other NPPF employees, they received letters denying their applications for COM approval. The denial letters state that they lack qualifying employment by or on behalf of the U.S. government because they were "employed by the Afghan Public Protection Force/National Public Protection Force, a state-owned enterprise of the Afghan government and not qualifying employment for the Afghan Special Immigrant Visa program."

46.      The denial letters do not provide any further justification or explanation for denying COM approval.

47.     As a result of being denied COM approval, dozens of applicants who were employed by NPPF or other Afghan state-owned entities that held contracts or subcontracts with the U.S. government, as well as employees of the Afghan government who were employed pursuant to a contract or subcontract with the U.S. government, are unable to proceed further in the process to apply for an Afghan SIV.

### *Plaintiff Yasini Doe*

48.     In August 2019, Plaintiff Yasini Doe was hired by the NPPF to work as a security guard for U.S. forces in Afghanistan pursuant to a subcontract with the U.S. government.

49.     Yasini performed critical security services for the U.S. government for two years until the contract under which he worked was abruptly terminated in August 2021 following the withdrawal of U.S. troops from Afghanistan.

50.     As part of his work for the U.S. government, Yasini was required to undergo numerous background checks, vetting, and interviews by U.S. government officials.

51.     Yasini's job entailed guarding a warehouse facility at Bagram Air Base, at that time a U.S.-controlled military base in Afghanistan. As part of his job, Yasini was responsible for duties including verifying the identity of all personnel entering the facility and tracking and screening vehicles and trucks entering that area of the military compound.

52.     Yasini was employed pursuant to a subcontract between NPPF and a private security company, Anham, which held a direct contract with the U.S. government to provide security and logistics services.

53.     Yasini was paid by NPPF, using U.S. funds paid to the prime contractor, Anham, in exchange for services under the prime contract, which were transferred by Anham to NPPF.

54.     As a result of his service to the U.S. military, Yasini and his family faced grave danger. Because Yasini's family lived outside the city where the U.S. military base was located and travel could be life-threatening, it was very risky for Yasini to visit his family.

55.     Two of Yasini's colleagues who were contracted by NPPF to provide security services to the U.S. government were murdered by the Taliban while traveling on a highway to visit their family. Another colleague was arrested and killed by the Taliban while visiting his family after a member of the Taliban saw a photo of him with U.S. soldiers on his phone.

56.     Despite the risks to his life, Yasini continued to provide faithful service to the U.S. government as an employee of NPPF.

57.     In August 2021, U.S. forces withdrew from Afghanistan and the contracts that Yasini worked under were terminated, along with his employment.

58.     Yasini went into hiding as the Taliban began targeting Afghans who had worked for the U.S. government.

59.     Desperate to find a pathway to safety for himself and his family, Yasini filed an application for COM approval in November 2021, weeks after the U.S. government withdrew and the Taliban took over governance of Afghanistan.

60.     In support of his application, Yasini submitted, among other things, a letter of recommendation from his direct supervisor at NPPF and an employment verification letter and letter of recommendation from Anham, the prime contractor, verifying his employment pursuant to a contract with the U.S. government and including the contract information for both the prime contract and subcontract pursuant to which Yasini worked.

61.     In addition, information on the prime contract under which Yasini worked is available via the Federal Procurement Data System.

14

62. On August 17, 2022, Defendants assigned Yasini's case a COM case number. Yasini expected that his application would soon be approved, and he would then be able to file an SIV application for himself and his family and eventually travel to safety in the United States.

63. But after waiting over a year and a half, Yasini received a boilerplate denial of his application for COM approval. In a letter dated June 22, 2023, the Chief of Mission informed Yasini that his application was denied on account of "lack of qualifying employment by or on behalf of the USG."

64. The letter continued, "You have not established that you were employed by or on behalf of the U.S. government. You submitted employment documentation, but you were employed by the Afghan Public Protection Force/National Public Protection Force, a state-owned enterprise of the Afghan government and not qualifying employment for the Afghan [SIV] program."

65. The letter provided no other ground for Defendants' denial of Yasini's COM approval.

66. Because Yasini had provided all the documentation required by the State Department and worked directly for U.S. forces, risking his life on the front lines to guard a U.S. military base, he was stunned.

67. Yasini filed an appeal in July 2023, but this was denied for the same reason in a letter dated December 20, 2023: lack of "qualifying employment."

68. Yasini filed a second COM application in December 2023, only to receive another denial in July 2024, repeating the same boilerplate reason.

69. Since receiving these COM denials, Yasini has struggled with depression and currently takes medication to get through each day. For the past four years since the Taliban took

over Afghanistan, he and his family have been on the run, changing location every few weeks to avoid being traced.

72. Yasini's brother-in-law performed the same job as Yasini, working as a security guard at a different U.S. base pursuant to a U.S. government contract, but because he was employed by a private security company, he has been granted COM approval and an SIV, and relocated to safety in the United States.

71. Meanwhile, Yasini remains in hiding, with no path to safety, worried each day that he will be discovered by the Taliban and killed.

72. In concluding that Yasini's employment did not qualify, Defendants relied solely on the nature of his employer as an Afghan state-owned entity. They failed to conduct an independent review of records maintained by the U.S. government and failed to consider whether Yasini provided faithful and valuable service to the U.S. government as documented in his letters of recommendation.

73. On no occasion in their COM adjudications have Defendants identified or cited any derogatory information pertaining to Yasini.

74. Because Defendants have denied COM approval, Yasini is unable to proceed any further with his application to immigrate to the United States under the Afghan SIV program and remains in danger in Afghanistan because of his work for the United States.

### *Plaintiff Jawad Doe*

75. In 2013, Plaintiff Jawad Doe was hired by NPPF to work as a security guard for U.S. forces in Afghanistan pursuant to a subcontract with the U.S. government.

76. Jawad worked for the U.S. government for over 8 years until his employment for NPPF was terminated in August 2021 following the withdrawal of U.S. troops from Afghanistan.

77.     Jawad's job entailed guarding a warehouse facility storing food for U.S. troops at Bagram Air Base. As part of his job, Jawad was responsible for duties including guarding the warehouse, verifying the identification of all personnel entering the facility and screening vehicles and trucks entering that area of the military compound.

78.     He was employed pursuant to a subcontract between NPPF and a private security company, Anham, which held a prime contract with the U.S. government to provide security and logistics services.

79.     As part of his work for the U.S. government, Jawad was required to submit biometrics and undergo vetting and security screening.

80.     Jawad's wages were paid by NPPF using U.S. funds paid to the prime contractor and transferred from the prime contractor to NPPF.

81.     As a result of his service to the U.S. military, Jawad and his family faced grave danger. Yet despite the risks to his life, he continued to provide faithful service to the U.S. government.

82.     In the days before the fall of Kabul, Jawad began to hear rumours that the government might collapse and the Taliban would take over. Worried for his safety and the safety of his family, he decided to apply for the Afghan SIV program. He began reaching out to commanders to get letters of recommendation in support of his application.

83.     Following the withdrawal of U.S. troops from Afghanistan in August 2021, Jawad's employment was terminated, and he was forced to flee into hiding as the Taliban began targeting Afghans who had worked for the U.S. government.

84.     In November 2021, Jawad filed an application for COM approval. In support of his application, Jawad submitted, among other things, letters of recommendation from supervisors at

NPPF and Anham, and an HR letter verifying his employment pursuant to a contract with the U.S. government, including the contract numbers for the prime contract and subcontract pursuant to which Jawad worked.

85.    In addition, information on the prime contract under which Jawad worked is available via the Federal Procurement Data System.

86.    On August 16, 2022, Defendants assigned Jawad's case a COM case number. Jawad expected that his application would soon be approved and he would then be able to file an SIV application for himself and his family and eventually travel to safety in the United States.

87.    In the months that followed, Jawad began hearing of other people who had worked for the U.S. government receiving COM approval. He was hopeful that soon he would receive news of his own COM approval. In anticipation of relocating to the United States, he sold his land and many of his possessions. He used the money to acquire the necessary travel documents and to rent a small house where he and his family could hide from the Taliban.

88.    But after waiting over a year and a half, Jawad received a boilerplate denial of his application for COM approval. In a letter dated June 21, 2023, the Chief of Mission informed Jawad that his application was denied on account of "lack of qualifying employment by or on behalf of the USG."

89.    The letter continued, "You have not established that you were employed by or on behalf of the U.S. government. You submitted employment documentation, but you were employed by the Afghan Public Protection Force/National Public Protection Force, a state-owned enterprise of the Afghan government and not qualifying employment for the Afghan [SIV] program."

90.     The letter provided no other ground for Defendants' denial of Jawad's COM approval.

91.     Jawad had understood that by providing security services directly for the U.S. government for over 8 years, he would easily qualify for an SIV. Devastated and hopeless, he filed an appeal within days, desperately hoping that there had been a mistake, only to receive another denial on December 13, 2023 restating the same reason for the initial denial: lack of "qualifying employment."

92.     Since then, Jawad lives in hiding in fear for his life. He continues to hear news of the Taliban arresting, torturing and killing people who worked for the U.S. government. He is worried that he will suffer the same fate as his son, who was paralyzed after being shot by a member of the Taliban, or worse, be killed.

93.     In concluding that Jawad's employment did not qualify, Defendants relied solely on the nature of his employer as an Afghan state-owned entity. Defendants failed to conduct an independent review of records maintained by the U.S. government and failed to consider whether Jawad provided faithful and valuable service to the U.S. government as documented in his letters of recommendation.

94.     On no occasion in their COM adjudications have Defendants identified or cited any derogatory information pertaining to Jawad.

95.     Because Defendants have denied COM approval, Jawad is unable to proceed any further with his application to immigrate to the United States under the Afghan SIV program and remains in danger in Afghanistan because of his work for the United States.

### *Plaintiff Reza Doe*

96.     In January 2019, Plaintiff Reza Doe was hired by the NPPF to work as a security guard for U.S. forces in Afghanistan pursuant to a subcontract with the U.S. government.

97.     Reza worked for the U.S. government for over 2 years until his employment for NPPF was terminated in August 2021 following the withdrawal of U.S. troops from Afghanistan.

98.     Reza's job entailed guarding a warehouse at Bagram Air Base. As part of his job, Reza was responsible for duties including guarding the entrance gate, verifying the identification of all personnel entering the facility and screening vehicles and trucks entering the area.

99.     As part of his work for the U.S. government, Reza was required to undergo numerous background checks, vetting, and interviews by U.S. government officials.

100.     Reza worked for the U.S. government pursuant to a subcontract between NPPF and a private security company, Anham, which held a direct contract with the U.S. government to provide security and logistics services.

101.     Reza's wages were paid by NPPF using U.S. funds paid to the prime contractor and transferred from the prime contractor to NPPF.

102.     Reza faced risks to his life and his family because of his work for the U.S. government, yet he continued to provide faithful service to the U.S. government.

103.     After U.S. troops withdrew from Afghanistan, Reza's employment was terminated. He was scared that the Taliban would retaliate against him and his family because of his work for the U.S. government and he went into hiding with his family.

104.     Reza filed an application for COM approval in November 2021.

105.     In support of his application, Reza submitted, among other things, a letter of recommendation from his direct supervisor at NPPF, an employment verification letter from

NPPF, and a letter of recommendation from Anham, the prime contractor, verifying his employment pursuant to a contract with the U.S. government. He provided contract numbers for both the prime contract and subcontract, documenting the contractual relationship between NPPF and the U.S. government.

106.    In addition, information on the prime contract under which Reza worked is available via the Federal Procurement Data System.

107.    On May 24, 2022, Defendants assigned Reza's case a COM case number.

108.    While he waited for a decision on his application, Reza remained in hiding worried that he would be harmed if the Taliban found him.

109.    In June 2023, after waiting for over a year and a half, Reza received a denial of his COM application. In a letter dated June 22, 2023, the Chief of Mission informed Reza that his application was denied on account of "lack of qualifying employment by or on behalf of the USG."

110.    The letter continued, "You have not established that you were employed by or on behalf of the U.S. government. You submitted employment documentation, but you were employed by the Afghan Public Protection Force/National Public Protection Force, a state-owned enterprise of the Afghan government and not qualifying employment for the Afghan [SIV] program."

111.    Reza was shocked when he read the reason for the denial. He had been sure that he qualified for an SIV based on his service for the U.S. government. He did not understand why he would be denied COM approval when his life was at risk because of his work in service to the U.S. government.

112.    To compound his surprise, Reza learned that a friend who worked at the same U.S. base as him but was employed by a private company rather than NPPF had received COM

approval. This friend had worked on behalf of the U.S. government cleaning U.S. soldiers' uniforms. Reza felt betrayed given that he had placed his life on the line guarding the U.S. base.

113.    Reza appealed his COM denial in October 2023. His appeal was denied in December 2023 for the same reason: lack of "qualifying employment."

114.    In concluding that Reza's employment did not qualify, Defendants relied solely on the nature of his employer as an Afghan state-owned entity. Defendants failed to conduct an independent review of records maintained by the U.S. government and failed to consider whether Reza provided faithful and valuable service to the U.S. government as documented in his letters of recommendation.

115.    On no occasion in their COM adjudications have Defendants identified or cited any derogatory information pertaining to Reza.

116.    Because Defendants have denied his COM approval, Reza is unable to proceed any further with his application to immigrate to the United States under the Afghan SIV program. He remains in danger in Afghanistan because of his work for the United States and has no means to support his family because it is unsafe for him to work.

## FIRST CLAIM FOR RELIEF
### (Administrative Procedure Act, Denial Policy)

117.    The foregoing allegations are repeated and realleged as though fully set forth herein.

118.    It is Defendants' policy to deny COM approval to applicants employed by an Afghan state-owned entity or the Afghan government, military or police, notwithstanding that they performed faithful and valuable service while employed on behalf of the U.S. government pursuant to a U.S. government contract or subcontract held by their employer ("Denial Policy").

119. The Denial Policy is final agency action subject to judicial review. *See* 5 U.S.C. § 704.

120. The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The APA requires agency action that is substantive (or "legislative") in nature to follow notice and comment procedures. *See* 5 U.S.C. §§ 553; 706(2)(D).

121. Under the Afghan Allies Protection Act, an applicant may establish qualifying employment if they were employed "on behalf of" the U.S. government and "provided faithful and valuable service" "which is documented in a positive recommendation or evaluation." AAPA § 602(b)(2)(A)(ii),(iii).

122. The Denial Policy is ultra vires, an abuse of discretion, and otherwise not in accordance with law, and an invalid legislative rule for which Defendants failed to observe the required procedures.

123. The Denial Policy is arbitrary and capricious because, in adopting a policy that employees of the Afghan government or an Afghan state-owned entity are ineligible for COM approval, Defendants failed to articulate a reasoned explanation for their decision, which represents a change in agency policy; failed to consider relevant factors; considered factors that Congress did not intend to be considered; failed to articulate a rational connection between the facts found and the choices made; and failed to consider serious reliance interests and reasonable alternatives.

124.     The Denial Policy therefore must be held unlawful and set aside. *See* 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### (Administrative Procedure Act, Denial of Chief of Mission Approval)

125.     The foregoing allegations are repeated and realleged as though fully set forth herein.

126.     Defendants' denial of COM approval for each Plaintiff, including their decision to uphold that denial, is final agency action subject to judicial review. *See* 5 U.S.C. § 704.

127.     The Administrative Procedure Act ("APA") provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

128.     Defendants' denial of COM approval for each Plaintiff based on their application of the Denial Policy and their employment by an Afghan state-owned entity was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

129.     Defendants' denial of COM approval for each Plaintiff and the findings and conclusions therein therefore must be held unlawful and set aside. *See* 5 U.S.C. §§ 704, 706(2).

## THIRD CLAIM FOR RELIEF
### (Administrative Procedure Act, Afghan Allies Protection Act, Denial of Chief of Mission Approval)

130.     The foregoing allegations are repeated and realleged as though fully set forth herein.

131.     Defendants' denial of COM approval for each Plaintiff, including their decision to uphold that denial, is final agency action subject to judicial review. *See* 5 U.S.C. § 704.

132.     The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

133.    The Afghan Allies Protection Act requires the Chief of Mission to "conduct . . . an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service."  AAPA § 602(b)(2)(D)(i).

134.    In denying Plaintiffs' applications for COM approval, Defendants failed to conduct the requisite review of records.

135.    Defendants' denial of COM approval for each Plaintiff must be held unlawful and set aside. *See* 5 U.S.C. §§ 704, 706(2).

**FOURTH CLAIM FOR RELIEF**
**(*Accardi* Doctrine & Administrative Procedure Act – Denial Policy, Denial of Chief of Mission Approval)**

136.    The foregoing allegations are repeated and realleged as though fully set forth herein.

137.    The State Department's Denial Policy violates its own guidance, including guidance set forth in the Foreign Affairs Manual, which makes clear that employment pursuant to an employer's contract or subcontract with the U.S. government amounts to qualifying employment for the Afghan SIV program. Defendants' Denial Policy, and its denials of COM approval for each Plaintiff, violate the State Department's guidance as set forth in the Foreign Affairs manual and are unlawful and must be set aside under the principles articulated in *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954).

138.    The Denial Policy, and the denials of COM approval for each Plaintiff, fail to comply with the agency's own guidance, rendering them arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.     Declare that the denial of Plaintiffs' COM approval applications and COM appeals and the Denial Policy are unlawful.

2.     Vacate and set aside Defendants' denial of COM approval to each Plaintiff, and the Denial Policy;

3.     Remand each Plaintiff's COM approval application or appeal to the State Department for reconsideration;

4.     Enjoin Defendants from continuing to apply the Denial Policy;

5.     Award attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and any other applicable statute or regulation; and

6.     Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: October 16, 2025

Respectfully submitted,

/s/ Mevlüde Akay Alp

Mevlüde Akay Alp (D.D.C. Bar No. NY0664)
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
One Battery Park Plaza
33rd Floor
New York, New York 10004
Telephone: (646) 988-9876
makayalp@refugeerights.org

Dalia Fuleihan*
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
P.O. Box 47611
Chicago, IL 60647
Telephone: (646) 740-6271
dfuleihan@refugeerights.org

Megan Hauptman (D.C. Bar No. 1780749)
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
650 Massachusetts Avenue NW, Suite 600
Washington, D.C. 20001
Telephone: (646) 939-7329
mhauptman@refugeerights.org

*Attorneys for Plaintiff*

**Pro bono representation certificate
forthcoming*